The Honorable Dennis Young State Representative Post Office Box 1835 Texarkana, Arkansas 75504
Dear Representative Young:
This is in response to your request for an opinion on two questions relating to the State Comprehensive Health Insurance Pool (the "Pool"), created by Act 1339 of 1995, the Comprehensive Health Insurance Pool Act, codified at A.C.A. §§ 23-79-501 to -510 (Supp. 1995) (the "Act"), and the Board of Directors of the Pool (the "Board"), also created by the Act. I have paraphrased your questions as follows:
 1. Does the Act require the Board to comply with the Arkansas Purchasing Law, A.C.A. §§ 19-11-201 to -262 (Repl. 1994 and Supp. 1995) (the "Purchasing Law"), in selecting an administering insurer for the Pool?
 2. Is the Pool subject to the Freedom of Information Act of 1967, A.C.A. §§ 25-19-101 to -107 (Repl. 1992 and Supp. 1995) (the "FOIA")?
The Act requires the Board to "[s]elect an administering insurer in accordance with § 23-79-506." That statute provides in relevant part:
 (1) The board shall select an insurer, through a competitive bidding process, to administer the plan.
 (2) The board shall evaluate the bids submitted under this subsection based on criteria established by the board, which criteria shall include, but not be limited to, the following:
 (A) The insurer's proven ability to handle large group accident and health policies insurance;
(B) The efficiency of the insurer's claims-paying procedures;
(C) An estimate of total charges for administering the plan.
A.C.A. § 23-79-506(a).
In my opinion, the Act itself does not require the Board to comply with the Purchasing Law in selecting an administering insurer. The legislature's use of the article "a," in requiring a competitive bidding process, and the discretion enjoyed by the Board in establishing criteria to be met by the successful bidder, indicate that the General Assembly did not intend for the Act itself to require the Board's use of the Purchasing Law. If the Act had been so intended, the legislature could have easily expressed that intention by simple reference to the Purchasing Law.
The question remains, however, whether the Purchasing Law, by its own terms, applies to the Board's selection of an administering insurer. Nothing in the Act purports expressly to exempt the selection from the Purchasing Law.
The Purchasing Law applies to "every expenditure of public funds by this state, acting through a state agency as defined in § 19-11-203, under any contract." A.C.A. § 19-11-207(a) (Repl. 1994). "State agency" is defined in relevant part as "any office, department, commission, council, board, bureau, committee, institution, legislative body, agency, government corporation, or other establishment or official of the executive, judicial, or legislative branch of this state. . . ." A.C.A. §19-11-203(25) (Repl. 1994).
A prior opinion of this office addresses whether a solid waste management district is a state agency for purposes of the Purchasing Law and concludes that it is not. See Op. Att'y Gen. 91-442 (copy enclosed). That opinion relies heavily upon Muse v. Prescott School Dist., 233 Ark. 789,349 S.W.2d 329 (1961), wherein the Supreme Court of Arkansas stated:
 In determining the question of [state] agency [status], it is also interesting to note that we have repeatedly held that an agency of the state cannot be sued since a suit against such an agency is, in fact, a suit against the state itself.
Muse, 233 Ark. at 794.
The Muse court, and this office in Op. Att'y Gen. 91-442, also cited the entity's ability to finance its own operations without biennial appropriations, and the quasi-independent manner in which each may operate. Here, it is clear that the Board may sue and be sued and that, as described below, the Pool's operations will be financed by payments from private entities and individuals, not from legislative appropriations. The Board will have considerable autonomy in operating the Pool, although the State, acting through the Insurance Commissioner, will retain some degree of authority. Due primarily to the fact that the Board may sue and be sued, it is my opinion that the Pool is not a state agency for purposes of the Purchasing Law and therefore is not subject to the Purchasing Law.[1]
With respect to your second question, the Act is not entirely clear on the question of whether the Pool is a private entity or a governmental entity for purposes of the FOIA. To the extent the Pool is deemed to be a governmental entity, it is, of course, subject to the FOIA. See A.C.A. §25-19-103 (Repl. 1992).
The Act provides that the Pool is a "nonprofit legal entity" of which all "insurers" (as defined in the Act) are members. A.C.A. § 23-79-503(a). It also provides that the governing body of the Pool, the Board, may exercise the powers granted to insurers under state law and may sue and be sued. A.C.A. § 23-79-506(1) and (2). These provisions suggest the General Assembly may not have intended for the Pool to be regarded as a governmental entity. While I assume for purposes of this opinion that the Pool is a private entity, not a governmental body, I am unable to render a definitive opinion to that effect, particularly in view of the Board's power, discussed below, to make mandatory assessments against health insurers doing business in the state, which power may be construed as a limited power to tax.
In addition to governmental bodies, the FOIA applies to the records of any entity, and the meetings of the governing body of any entity, that is supported in whole or in part by public funds, or that expends public funds. See A.C.A. §§ 25-19-103, -106(a) (Repl. 1992). These provisions have been interpreted to mean that a private entity that receives public funds, and whose activities are of public concern and intertwined with those of the government, is subject to the FOIA. Rehab Hospital ServicesCorp. v. Delta-Hills Health Systems Agency, Inc., 285 Ark. 397,687 S.W.2d 840 (1985); North Central Ass'n of Colleges Schools v. TrouttBrothers, Inc., 261 Ark. 378, 548 S.W.2d 825 (1977).
In my opinion, the Pool's activities will be of public concern and intertwined with those of the government. The Act appears to have been passed to establish a mechanism for providing health insurance to residents of the state who are "uninsurable" or who have difficulty procuring private insurance, and who do not receive health benefits from another government program. See A.C.A. § 23-79-509(b). Clearly, the General Assembly determined that government intervention was necessary and appropriate in order for such persons to receive health insurance. Although the legislature determined to provide access through the establishment of the Pool, it is clear that it could have accomplished the same purpose through a body wholly governmental in nature. Members of the Board are appointed by the Insurance Commissioner, who must approve the Board's organizational and operational documents, policy forms, and premium rates, and who may promulgate rules to effectuate the Act if the Board fails to act in a timely manner. A.C.A. §§ 23-79-503(b) and (c), -504(5), -510(e)(5). The Board is authorized to compel insurers to pay assessments at times and in amounts determined by the Board, a power that constitutes, or at least resembles, a limited power to tax. A.C.A. §§23-79-504(4)(A) and (C), -505(3), -506(7)(B). Finally, as discussed below, the assessments will be funds that, but for the Act, generally would be paid directly to the state.
The more difficult issue is whether the Pool receives public funds. The Act contemplates that the Pool will receive funds from two groups: insured individuals, who will pay premiums to the administering insurer; and health insurers doing business in the state, who will pay amounts assessed by the Board. See A.C.A. §§ 23-79-506(c)(3), -504(4)(A) and (C), -505(3), -506(7)(B). The Act also provides:
 Any assessment may be offset in an amount equal to the amount of the assessment paid to the pool against the state corporate income tax or the premium tax payable by that participating insurer for the year in which the assessment is levied, or the four (4) years subsequent to that year.
A.C.A. § 23-79-508(a).
While assessments against insurers will be paid directly to the Pool, rather than to the state treasury, it appears that funds arising from assessments generally will be funds that, in the absence of the Act, would have been paid directly to the state as income or premium taxes.
In Sebastian County Chapter of the American Red Cross v. Weatherford,311 Ark. 656, 846 S.W.2d 641 (1993), the court held that a private entity that leased government property at a below-market rate, and thus received an indirect benefit from the government, was not receiving "public funds" within the meaning of that phrase as used in the FIOA. The court quoted with approval a dictionary definition of "public funds" as "Moneys belonging to government, or any department of it, in hands of public official." Weatherford, 311 Ark. at 659, quoting BLACK'S LAW DICTIONARY (6th ed. 1990). The court also stated that "[t]he plain language of the FOIA confirms that the General Assembly intended that direct public funding be required." Weatherford, 311 Ark. at 660.
In my opinion, funds received by the Pool from insured individuals as premium payments will not constitute public funds under the FOIA. With respect to assessments from insurers, it certainly can be argued that the court's statements in Weatherford quoted above mean that the assessments do not constitute public funds because they do not belong to the government, are never in the hands of a public official, and do not constitute direct public funding. On the other hand, Weatherford can be easily distinguished from the situation at hand as not involving cash in any amount or from any source, and involving an entity that was created by persons other than the government and clearly private in nature.
While I am unable to render a definitive opinion, I am of the view that the assessments contemplated by the Act would be interpreted to constitute public funds within the meaning of the FOIA. Both membership in the Pool and payment of the assessments are mandatory, and the assessments are subject to the Board's determinations with respect to timing and amount. Payment of an assessment will directly reduce the insurer's tax liabilities, if any, to the state. I perceive little substantive difference between the Act's scheme of assessments and an arrangement under which the Board received the same amounts from state treasury collections of income and premium taxes. I believe the courts, if faced with this question, likely would characterize the statements from Weatherford quoted above as dicta that does not control a case wherein an entity created by the government, possessing powers resembling the power to tax, and not clearly a private entity receives funds that, in the absence of statutes creating the entity, would be paid to the state. I accordingly conclude that the Pool's records and the Board's meetings are subject to the public records and open meetings requirements of the FOIA.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General J. Madison Barker.
Sincerely,
WINSTON BRYANT Attorney General
WB:JMB/cyh
[1] The foregoing opinion is not intended to be, and should not be interpreted as, stating any conclusion with respect to whether any of the Pool's funds are "public funds" for purposes of the Purchasing Law, or whether the Pool is a state agency for any purposes of any law other than the Purchasing Law.